1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10

11 DANIEL LAUFENBERG,                    ) Case No. CV 15-7927-JPR
                                         )
12                  Plaintiff,           )
                                         )
13           v.                          ) **MEMORANDUM DECISION AND ORDER**
                                         ) **AFFIRMING COMMISSIONER**
14 CAROLYN W. COLVIN, Acting             )
   Commissioner of Social               )
15 Security,                            )
                                         )
16                  Defendant.           )
                                         )
17

18 **I.    PROCEEDINGS**

19      Plaintiff seeks review of the Commissioner's final decision

20 denying his application for Social Security disability insurance

21 benefits ("DIB").  The parties consented to the jurisdiction of

22 the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).

23 The matter is before the Court on the parties' Joint Stipulation,

24 filed June 3, 2016, which the Court has taken under submission

25 without oral argument.  For the reasons stated below, the

26 Commissioner's decision is affirmed.

27
28

1

**II.   BACKGROUND**

Plaintiff was born in 1958 (Administrative Record ("AR") 121), graduated college and law school (AR 226), and worked as an attorney in "the early 1990s" (AR 49-50, 138-39).

On April 1, 2012, Plaintiff applied for DIB, alleging that he had been unable to work full time since November 13, 1998, because of degenerative disc disease and chronic pain. (See AR 46-47, 121-22, 134.)  His last insured date was December 31, 2001.  (AR 25.)  After his application was denied initially and on reconsideration, he requested a hearing before an Administrative Law Judge.  (AR 54-56, 66-67.)  A hearing was held on April 8, 2013, at which Plaintiff, who represented himself, appeared and testified.  (AR 42, 44.)  No expert witnesses appeared at the hearing (see AR 42); instead, the ALJ obtained expert testimony by propounding posthearing interrogatories to a vocational expert (AR 225) and sending questionnaires to two medical experts (AR 498-513).  The ALJ issued an unfavorable decision on September 9, 2013, finding that Plaintiff was not disabled as of his date last insured.  (AR 25, 31.)  Plaintiff requested review from the Appeals Council, and on April 23, 2015, it denied review.  (AR 15-17, 18.)  This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial

evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  <u>Richardson</u>, 402 U.S. at 401; <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. <u>Lingenfelter</u>, 504 F.3d at 1035 (citing <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir. 1998).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's.  <u>Id.</u> at 720-21.

**IV.   THE EVALUATION OF DISABILITY**

Claimants are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   <u>The Five-Step Evaluation Process</u>

The ALJ follows a five-step sequential evaluation process to assess whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is

not disabled and the claim must be denied.  § 404.1520(a)(4)(i).

       If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, the claimant is not disabled and his claim must be denied.  § 404.1520(a)(4)(ii).

       If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. § 404.1520(a)(4)(iii).

       If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform his past work; if so, he is not disabled and the claim must be denied.  § 404.1520(a)(4)(iv).  The claimant has the burden of proving he is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.

       The Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other

_____

       [1] RFC is what a claimant can do despite existing exertional and nonexertional limitations.  20 C.F.R. § 404.1545; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

1  substantial gainful work available in the national economy.

2  § 404.1520(a)(4)(v); Drouin, 966 F.2d at 1257.  That

3  determination comprises the fifth and final step in the

4  sequential analysis.  § 404.1520(a)(4)(v); Lester, 81 F.3d at 828

5  n.5; Drouin, 966 F.2d at 1257.

6      B.   The ALJ's Application of the Five-Step Process

7  At step one, the ALJ found that Plaintiff had not engaged in

8  substantial gainful activity from his alleged onset date of

9  November 13, 1998, through his date last insured, December 31,

10  2001.  (AR 25.)  At step two, he concluded that Plaintiff had

11  severe impairments of "lumbar and cervical degenerative disc

12  disease" (AR 25-26), but his "medically determinable mental

13  impairments of depression" were "nonsevere" (AR 27).  At step

14  three, he determined that Plaintiff's impairments did not meet or

15  equal a listing.  (Id.)

16  At step four, the ALJ found that Plaintiff had the RFC to

17  perform light work with the following additional limitations:

18      [he] cannot lift or carry more than 20 pounds

19      occasionally and 10 pounds frequently[;] . . . cannot

20      sit, stand, or walk longer than 6 hours in an 8-hour

21      workday[;][2] . . . requires a sit/stand option[;] . . . is

22      limited to occasional reaching and operation of foot

23      controls[;] . . . is precluded from climbing ladders or

24

25  [2] The ALJ apparently meant that Plaintiff cannot sit, stand,
or walk for more than six hours each in an eight-hour workday.

26  (See AR 504 (Dr. Alpern's physical assessment noting that
Plaintiff could sit, stand, or walk for two hours each "without

27  interruption" and for a total of six hours each in an eight-hour
workday); see also AR 29 (ALJ adopting "functional limitations of

28  Dr. Alpern").)

scaffolds and limited to occasional climbing of stairs or
ramps, balancing, stooping, kneeling, crouching, and
crawling[; and] . . . is limited to occasional work
around unprotected heights and moving mechanical parts.
(AR 27-28.)   In determining Plaintiff's RFC, the ALJ relied on
the physical function assessment by Dr. Harvey Alpern, one of the
medical experts (AR 29), and discounted Plaintiff's subjective
testimony as "not credible" to the extent he alleged an
"inability to perform any work activity" (AR 28).[3]  Applying
Plaintiff's RFC, the ALJ found that he could not perform his past
relevant work as an attorney or legal instructor.  (AR 29-30.)

At step five, the ALJ relied on the VE's written testimony,
finding that based on Plaintiff's RFC for limited light work, he
was able to perform "representative occupations" existing in
significant numbers in the national economy, including
(1) "surveillance system monitor," DOT 379.367-010, 1991 WL
673244, which was sedentary work, and (2) "gate guard," DOT
372.667-030, 1991 WL 673099, which was light work.  (AR 30-31.)
Accordingly, the ALJ found him not disabled.

**V.   DISCUSSION**

Plaintiff argues that the ALJ failed to (1) consider the
"opinion" testimony of his treating physician, Dr. Vernon
Williams, in evaluating the medical evidence; (2) account for Dr.
Alpern's restriction of a one-day-a-month work disruption; and
(3) resolve an apparent conflict between the VE's testimony and

---

[3] Plaintiff does not challenge the ALJ's adverse credibility
finding.  (See generally J. Stip.)

6

the DOT regarding the sit/stand option.   (<u>See</u> J. Stip. at 2, 4-6,
9-10, 14-15.)   For the reasons discussed below, remand is not
warranted.

      A.   <u>The ALJ Properly Accounted for Dr. Williams's Opinion</u>
           <u>in Assessing the Medical Evidence</u>

     Plaintiff argues that the ALJ failed to consider a
transcript of Dr. Williams's opinion testimony from Plaintiff's
divorce proceeding in October 2011.   (J. Stip. at 4-6 (citing AR
210).)   The ALJ did not err.

         1.   <u>Relevant background</u>

             a.  *Dr. Williams's treatment of Plaintiff*

     Plaintiff injured his neck and back in an automobile
accident on November 13, 1998, resulting in two herniated disks
in his neck.[4]   (AR 46, 208, 393-94.)   In April 1999, he sought
treatment at the Kerlan-Jobe Orthopaedic Clinic, which initially
consisted of a conservative regime of physical therapy and
narcotic and anti-inflammatory medications, but he subsequently
opted for surgical intervention to alleviate his persistent arm
and neck pain.[5]   (AR 208, 393-95.)   After undergoing an anterior
cervical discectomy and fusion and a posterior cervical in April
2000 (AR 395), Plaintiff was referred to Dr. Williams, a pain-
management specialist at the same clinic, for long-term care (AR
185, 419-20).

---

[4] He had undergone a lumbar laminectomy in 1993 as a result
of an unrelated automobile accident.   (AR 46, 208.)

[5] Plaintiff also underwent arthroscopic ankle surgery in
August 1999.   (AR 208, 394.)

Dr. Williams first saw Plaintiff in November 2001[6] and continued seeing him for follow-up "maintenance" visits every two to four months at least until 2011, mostly for refills of prescription medications and face-to-face counseling.  (See, e.g., AR 185, 328-29, 421.)  Dr. Williams's treatment for Plaintiff's chronic pain consisted primarily of pharmacotherapy — including prescribing primary analgesics, adjunctive medications, and opioids — to which Plaintiff responded positively.[7]  (See, e.g., id.; J. Stip. at 4 (noting that "pain medication became his primary treatment").)  During the initial visit on November 30, 2001, Dr. Williams found that Plaintiff's pain had been effectively controlled by medication,[8] noting that "[t]o make the pain better, the patient rests and takes medication" (AR 420), and that his neck and upper-left-extremity pain was an eight on the pain scale "without medications" but "medications help calm it down to 4 or 5/10" (AR 421).  Dr. Williams found in particular that Vicodin was "quite helpful" and "well tolerated" when taken "three or four times per week," as Plaintiff himself noted.

---

[6] As the Commissioner correctly indicates, Plaintiff started seeing Dr. Williams right before his date last insured, December 31, 2001.  (See J. Stip. at 6.)

[7] According to Dr. Williams, "primary analgesics" are pain medications whose primary function is to "reduce pain" — as in, "all they do is reduce pain" — whereas "adjunctive medications" have a non-pain-management purpose but may be prescribed for their secondary effect, "help[ing] to reduce pain."  (See AR 204.)

[8] At the time he was taking Vicodin, Fioricet, Elavil, Ambien, and Soma.  (AR 419-20.)  Dr. Williams discontinued Elavil for lack of effectiveness but put him on a trial of "Lidocaine patch."  (AR 421.)

1  (<u>Id.</u>)

2      Subsequently, Dr. Williams would consistently note that

3  Plaintiff was benefiting from the "medication regimen,"

4  especially Vicodin and Lidoderm patches, and "tolerating the

5  medications without difficulty" (<u>see</u> AR 338; <u>see, e.g.</u>, AR 334

6  (noting that Plaintiff "has been using [Lidoderm patches]," which

7  "have been quite effective for him"; his pain "certainly" would

8  "benefit (and has proven so) from the Lidoderm patch as it has a

9  significant analgesic benefit"), 415 ("He has been doing better

10 with using the medication on a scheduled dose basis.")), and

11 responding well to a TENS (transcutaneous electrical nerve

12 stimulation) unit and hot and cold treatment (<u>see</u> AR 232, 235).

13 (<u>See, e.g.</u>, AR 293 (Dec. 11, 2007 note ("essentially status quo"

14 since last appointment, next appointment in eight weeks), 392

15 (Sept. 13, 2002 note ("essentially status quo and deni[ed]

16 significant interval change"), 511 (Dr. Anderson's medical

17 questionnaire concluding that Plaintiff "appears to be stable

18 with meds + TENS unit")).)  Subjective feedback from Plaintiff

19 confirmed the efficacy of Dr. Williams's medication regimen.

20 (<u>See, e.g.</u>, AR 292, 314, 322, 329 (indicating that "pain

21 medications" were factor in decreasing or relieving pain); <u>see</u>

22 <u>also</u> AR 235 (listing "pain medications," hot and cold treatment,

23 and "TENS" as pain-relieving factors).)

24      Plaintiff experienced a setback in 2007, however, when he

25 decided — apparently against Dr. Williams's initial

26 recommendations (<u>see</u> AR 193, 203-04) — to "completely wean[]

27 himself off from narcotics" and primary analgesics, including

28 Vicodin, and instead rely solely on adjunctive medications for

pain management.  (See, e.g., AR 289 (Mar. 25, 2008 note
(Plaintiff appeared "visibly distressed" and "has completely
weaned himself off from narcotics and is only using his
Wellbutrin and lidocaine patches for pain in addition to recent
addition of aspirin")), 307 (Oct. 8, 2007 note (Plaintiff no
longer taking Vicodin and was "using Lidoderm patch at this time
for pain")).)

                    b.  *Dr. Williams's testimony in 2011*

     On October 12, 2011, Dr. Williams appeared as a witness in
Plaintiff's divorce proceeding and testified regarding his
"lengthy pain management treatment of" Plaintiff.[9]  (J. Stip. at
4; see AR 183, 185.)  In relevant part, Dr. Williams was asked
whether he thought Plaintiff could work at that time.  (AR 192-
95.)  Dr. Williams suggested that Plaintiff could no longer work
as an attorney or legal instructor because those professions
required a "significant amount" of "high-level cognitive
activities," which Plaintiff could not do given his "significant
pain" and "an inability to sit for extended periods of time."
(AR 193.)  Dr. Williams cautioned, however, that Plaintiff's
symptoms were in part caused by his decision in 2007 to
"discontinue certain kinds of . . . analgesic medications" and
"manage his pain without strong medications."  (Id.)

     Dr. Williams further indicated that he thought Plaintiff was
not "totally disabled" and did not have a "100 percent
disability."  (AR 194.)  Dr. Williams probably would not have

_____

     [9] Dr. Williams appeared as a witness for Plaintiff's wife
and was cross-examined by Plaintiff's attorney.

                              10

authorized a handicap placard for Plaintiff because he did not
have to rely on "some type of assistive device for ambulation,"
such as a wheelchair, walker, or cane.  (AR 195-96.)  Thus, Dr.
Williams agreed that Plaintiff could perform "general [work]
tasks" under certain conditions allowing him to "change positions
frequently," "sit when necessary when he had intolerable pain or
incapacitating pain," avoid "any heavy lifting, any repetitive
bending and rotation of the neck or the lumbar spine," and have
"some control over his environment . . . [to] manage the symptoms
. . . [of] his spine disease."  (AR 194, 210.)

　　　When asked whether Plaintiff's "condition" had changed from
2001 to 2011, Dr. Williams responded, "[y]es and no."  (AR 196.)
He explained that although there had been no "dramatic or
significant change in diagnosis," Plaintiff had had "periods of
time where he's had worsened pain as compared to other times,"
which was "fairly common with chronic pain conditions."  (Id.)

　　　　　　　　　　2.   Applicable law

　　　Three types of physicians may offer opinions in Social
Security cases: (1) those who directly treated the claimant,
(2) those who examined but did not treat the claimant, and
(3) those who did neither.  Lester, 81 F.3d at 830.  A treating
physician's opinion is generally entitled to more weight than an
examining physician's, and an examining physician's opinion is
generally entitled to more weight than a nonexamining
physician's.  Id.

　　　This is so because treating physicians are employed to cure
and have a greater opportunity to know and observe the claimant.
Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).  If a

treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight. § 404.1527(c)(2). If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's area of specialization, and other factors. § 404.1527(c)(2)-(6).

When a treating physician's opinion is not contradicted by other evidence in the record, it may be rejected only for "clear and convincing" reasons. See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (citing Lester, 81 F.3d at 830-31). When it is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it. Id. (citing Lester, 81 F.3d at 830-31). Furthermore, "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).

### 3. Analysis

The ALJ properly assessed all the medical evidence, expressly referencing Dr. Williams by name and citing his treatment records from Kerlan-Jobe Clinic. (See, e.g., AR 26-27, 29.) Even though the relevant disability period was between November 1998 and December 2001, the ALJ considered Plaintiff's

12

entire medical history — including all "records from the Kerlan-Jobe Clinic cover[ing] the period August 1999 through March 2011 (Exhibit 1F)." (See AR 26-27; see also AR 24, 25 (noting "careful consideration of all the evidence" and "entire record").) The ALJ's summary of Dr. Williams's extensive records accurately reflected Dr. Williams's view that Plaintiff's pain had been effectively managed by medication:

> [C]onsistent with the weight of the medical evidence . . . . [t]he claimant has a remote history of a back and neck injury sustained in a motor vehicle accident 15 years ago. He underwent cervical fusion more than a decade ago and has pursued only intermittent, conservative care for spinal pain since that time. The records from treating physician, Dr. Williams, show multiple physical examinations over a period of more than a decade with few physical findings. On the contrary, Dr. Williams consistently reported normal orthopedic and neurological findings and stated the claimant was doing well. He treated the claimant symptomatically for complaints of pain with a TENS unit and pain relief medication. He did not assess any functional limitations.

(AR 29.) Indeed, Plaintiff does not contest the ALJ's assessment of the medical evidence stemming from his treatment by Dr. Williams.

The ALJ's findings were entirely consistent with Dr. Williams's assessment and treatment records, including his divorce testimony: that Plaintiff had severe physical impairments

13

but was not disabled and could still work with certain restrictions.  The ALJ's discussion of Plaintiff's specific physical limitations in terms similar to those used by Dr. Williams suggests that he was aware of and accounted for Dr. Williams's opinion.  (See AR 26-28; see also J. Stip. at 6 (Plaintiff acknowledging that "ALJ's RFC finding includes some . . . limitations identified by Dr. Williams" in testimony).) Because the ALJ is charged with summarizing the relevant medical evidence and is not required "to discuss every piece of evidence," Howard v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003), the ALJ did not err in assessing the medical evidence.

Plaintiff's contrary assertions fail.  He faults the ALJ for allegedly ignoring Dr. Williams's "opinion" testimony from October 2011 regarding Plaintiff's functional limitations at that time.  (See J. Stip. at 5 ("ALJ did not address Dr. Williams's opinion regarding functional limitations at AR 210[.]").)  First, Dr. Williams's assessment as to Plaintiff's ability to work in October 2011 was only tangentially relevant to the ALJ's determination of whether he was disabled before December 2001. See Crane v. Shalala, 76 F.3d 251, 255 (9th Cir. 1996) (ALJ not required to seek out treatment notes postdating relevant period "after the insured status expired"); Hepp v. Astrue, 511 F.3d 798, 808 (8th Cir. 2008) (holding that "district court did not err in refusing to remand [plaintiff]'s case to the Commissioner for consideration of additional medical evidence," including medical-opinion letter addressing his condition "four years after his last date of coverage").  Although Plaintiff claims that Dr. Williams said Plaintiff's impairments had not significantly

changed since 2001, in fact he testified only that Plaintiff's "diagnosis" had not dramatically or significantly changed; his symptoms had. (See AR 186, 196.)  Indeed, given that Plaintiff's treating physicians at Kerlan-Jobe at one time assessed him as "temporarily totally disabled" (AR 426, 458) and later found that he could "continue working" or work "part-time" (AR 377, 385, 391), his condition could not have remained the same from 2001 to 2011.[10]

Second, as the doctor himself noted (see AR 193, 203-04), Plaintiff's decision to discontinue all narcotics medications in 2007 was a significant intervening factor explaining why Dr. Williams's opinion testimony in 2011 did not apply to the relevant period 10 years earlier. (See also AR 509-10 (Dr. Anderson's assessment showing no mental or physical symptoms but noting that "what is somewhat unusual is the absence of long

_____

[10] Plaintiff complains that the ALJ misstated Dr. Williams's treatment records to find that he had "no work restrictions" in 2003. (See J. Stip. at 5-6.)  But those were in fact his treating physicians' findings — albeit in workers'-compensation terms (see AR 366 (Aug. 22, 2003 note ("Work Status: No disability recommendation is made at this time"), 368 (Aug. 1, 2003 note (stating "No changes in work restrictions, part-time only" under "Work Restrictions"))).  The Kerlan-Jobe records show that Plaintiff was initially assessed as temporarily totally disabled for workers'-compensation purposes — meaning that at that time he had an "impairment reasonably expected to be cured or materially improved with proper medical treatment," Brooks v. Workers' Comp. Appeals Bd., 161 Cal. App. 4th 1522, 1529-30 (Ct. App. 2008) — but subsequently was upgraded in late 2002 to temporarily partially disabled, meaning that he could resume work in some capacity, namely, part time.  Moreover, the ALJ noted the "part time" restriction by Dr. Williams in August 2003 and then two sentences later stated that Dr. Williams "again" found that Plaintiff had "no work restrictions" in December 2003 and February 2004.  (AR 27.)  In context, Dr. Williams clearly meant that Plaintiff could still work part time.

1  acting opiates and since 9/07 the self cessation of all opiate

2  analgesic meds").)   Citing findings from both Dr. Williams and

3  Dr. Anderson, the ALJ noted that as of December 2010, Plaintiff

4  was taking "Lyrica [an anti-epileptic medication that controls

5  seizures] for pain relief and [had] not tak[en] any narcotic pain

6  relief medication" since 2007.   (AR 26.)

7       Lastly, any error was harmless because there was no material

8  difference between the ALJ's RFC and Dr. Williams's opinion.

9  Both the ALJ and Dr. Williams found that Plaintiff could no

10 longer work as an attorney or instructor.   (Compare AR 29-30,

11 with AR 192-95.)   The ALJ's RFC generally tracked Dr. Williams's

12 opinion at AR 210 that Plaintiff could work in jobs where he was

13 allowed to "change positions frequently," "sit when necessary

14 when he had intolerable pain or incapacitating pain," avoid "any

15 heavy lifting, any repetitive bending and rotation of the neck or

16 the lumbar spine," and have "some control over his environment .

17 . . [to] manage the symptoms of his spine disease." (Compare AR

18 27-28, with AR 194, 210.)   Although Plaintiff claims that Dr.

19 Williams assessed some period of time during which Plaintiff

20 would be absent or "away from work because of pain flare-ups and

21 for treatment" and faults the ALJ for not including such a limit

22 in the RFC (J. Stip. at 4-5), he points to no such findings by

23 Dr. Williams in the record.   Accordingly, any error was harmless.

24       B.   The ALJ's RFC Finding Was Supported by Substantial

25            Evidence

26       Plaintiff contends that the ALJ's RFC finding failed to

27 include a limitation allegedly noted by the nonexamining medical

28 expert, Dr. Harvey Alpern, of likely "miss[ing] one day of work a

month." (J. Stip. at 9-12, 14.)  The ALJ did not err.

### 1.  Relevant background

The ALJ submitted posthearing medical questionnaires to Dr. Anderson, a psychiatrist (AR 115), and Dr. Alpern, a cardiologist (AR 107).  Dr. Anderson found no mental impairments or limitations "currently" or as of August 2001. (AR 515-16.)  Dr. Alpern completed two forms, the questionnaire and an attached physical RFC assessment, both requiring him to respond "in the context of the . . . more recent time period."  (AR 498, 501.) Dr. Alpern noted in the RFC assessment that Plaintiff's functional limitations related back to 1998 but did not so indicate as to his answers on the questionnaire.  (AR 501, 508.) Dr. Alpern assessed a variety of limitations on the RFC form. When asked to state any other work activities that would be affected by any impairments, he drew a line, indicating that there were none.  (See AR 508.)

On the questionnaire, Dr. Alpern described Plaintiff as suffering from degenerative disc disease with symptoms of "pain." (AR 498-500.)  Dr. Alpern did not respond to the question, "how many times per month, if any, would [Plaintiff]'s physical impairments likely disrupt a regular work schedule that otherwise accommodated all limitations identified [in RFC assessment]?" (AR 501.)  But he wrote "once" in response to the next question, "how long would the average disruption last?"  (Id.)  Because no other physician assessed Plaintiff's functional limitations for the relevant period, the ALJ adopted Dr. Alpern's "most restrictive limitations in the record" as Plaintiff's RFC.  (AR 29.)

17

### 2.   Analysis

Plaintiff's contention about Dr. Alpern's alleged one-day-a-month limitation lacks merit.  Although the record is not entirely clear, Dr. Alpern likely meant to respond "once" to the first question, regarding the frequency of monthly work disruptions, not the second, concerning how long such a disruption would last.  But "once" in the context of "how many times per month" means one "time" a month, not one "day," as Plaintiff suggests.  Indeed, Dr. Alpern did not answer the question concerning how long that disruption would last, for a day or a minute.[11]

Further, unlike the functional-assessment form, which Dr. Alpern clarified related back to Plaintiff's limitations in 1998, the questionnaire instructed Dr. Alpern to respond based on the "more recent time period."  Thus, Dr. Alpern's once-a-month restriction applied to Plaintiff's then RFC, in 2013, which had likely worsened since 2007 because of Plaintiff's decision to stop taking pain medications.  See § 404.1530(a) ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work[.]").  Because Dr. Alpern left out that limitation in his RFC assessment even when he was asked to detail "any other limitations," he apparently did not mean for it to relate back to the relevant period before Plaintiff's date last insured.  Thus,

---

[11] Indeed, Dr. Williams testified that Plaintiff's "escalation in pain" is "usually short in duration and self-limited," typically "occur[ring] over the course of one to two minutes" but sometimes "last[ing] for 20 or 30 minutes" before returning "back down to baseline."  (AR 202.)

remand is not warranted.

    C.   <u>The ALJ Properly Relied on the VE's Testimony</u>

    Plaintiff contends that the ALJ's decision must be reversed because he failed to resolve an apparent conflict between the VE's testimony and the DOT. (J. Stip. at 14-16, 19.) For the reasons discussed below, remand is not warranted.

        1.   <u>Applicable law</u>

    To ascertain the requirements of occupations as generally performed in the national economy, the ALJ may rely on VE testimony or information from the Dictionary of Occupational Titles ("DOT"). SSR 00-4P, 2000 WL 1898704, at *2 (2000) (at steps four and five, SSA relies "primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy" and "may also use VEs . . . at these steps to resolve complex vocational issues"); SSR 82-61, 1982 WL 31387, at *2 (1982) ("The [DOT] descriptions can be relied upon — for jobs that are listed in the DOT — to define the job as it is <u>usually</u> performed in the national economy." (emphasis in original)).  "Neither the DOT nor the VE . . . automatically 'trumps' when there is a conflict."  SSR 00-4P, 2000 WL 1898704, at *2; <u>see also</u> <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1435 (9th Cir. 1995) (noting that DOT "is not the sole source of admissible information concerning jobs" (alteration and citations omitted)).

    When a VE provides evidence at step four or five about the requirements of a job, the ALJ has a responsibility to ask about "any possible conflict" between that evidence and the DOT.  <u>See</u> SSR 00-4p, 2000 WL 1898704, at *4; <u>Massachi v. Astrue</u>, 486 F.3d

1  1149, 1152-54 (9th Cir. 2007) (holding that application of SSR

2  00-4p is mandatory).  When such a conflict exists, the ALJ may

3  accept VE testimony that contradicts the DOT only if the record

4  contains "persuasive evidence to support the deviation."  <u>Pinto</u>

5  <u>v. Massanari</u>, 249 F.3d 840, 846 (9th Cir. 2001) (citing <u>Johnson</u>,

6  60 F.3d at 1435); <u>see also</u> <u>Tommasetti v. Astrue</u>, 533 F.3d 1035,

7  1042 (9th Cir. 2008) (finding error when "ALJ did not identify

8  what aspect of the VE's experience warranted deviation from the

9  DOT").

10      The DOT provides no information regarding the availability

11  of a sit/stand option or other need to shift positions during the

12  workday for any of the jobs it covers.  Thus, no actual conflict

13  between the DOT and a VE's testimony concerning a sit/stand

14  option exists.  <u>See</u> <u>Strain v. Colvin</u>, No. CV 13-01973-SH, 2014 WL

15  2472312, at *2 (C.D. Cal. June 2, 2014) (finding no conflict

16  between sit/stand option and DOT because "the DOT simply does not

17  address sit/stand options").  There is no controlling Ninth

18  Circuit law regarding whether a conflict arises when the DOT is

19  silent on a physical requirement, <u>cf.</u> <u>DeLorme v. Sullivan</u>, 924

20  F.2d 841, 850 (9th Cir. 1991) (noting that "when a claimant must

21  alternate periods of sitting and standing, the ALJ is directed to

22  consult a vocational expert," but remanding on other bases),

23  although an unpublished decision suggests as much, <u>see</u>

24  <u>Buckner-Larkin v. Astrue</u>, 450 F. App'x 626, 628-29 (9th Cir.

25  2011) (finding that "conflict" between at-will sit/stand option

26  and DOT was adequately addressed by VE based on VE's own research

27  and experience).

28      District courts in the Ninth Circuit are divided on whether

20

a conflict exists for limitations not addressed by the DOT,
including sit/stand options.   Compare Strain, 2014 WL 2472312, at
*2 (finding no apparent conflict between sit/stand requirement
and DOT), Gilmour v. Colvin, No. 1:13-cv-00553-BAM, 2014 WL
3749458, at *8 (E.D. Cal. July 29, 2014) (same), McBride v.
Comm'r of Soc. Sec., No. 2:12-cv-0948-CMK, 2014 WL 788685, at *8
(E.D. Cal. Feb. 25, 2014) (same), and Harvey v. Astrue, No.
09-02038 CW, 2010 WL 2836817, at *14 (N.D. Cal. July 16, 2010)
(same), with Lorigo v. Colvin, No. 1:13-CV-00405-SKO, 2014 WL
1577317, at *11 (E.D. Cal. Apr. 18, 2014) (holding that VE's
testimony "encapsulat[ing] a sit/stand option automatically
deviated from the DOT"), Valenzuela v. Astrue, No. C 08-04001
WHA, 2009 WL 1537876, at *3 (N.D. Cal. June 2, 2009) (finding
"potential[]" conflict between sit/stand requirement and VE's
testimony and remanding because ALJ did not ask whether VE's
testimony was consistent with DOT), Smith v. Astrue, No. C
09-03777 MHP, 2010 WL 5776060, at *12 (N.D. Cal. Sept. 16, 2010)
(same), and Brown v. Astrue, No. 2:11-CV-0665 DAD, 2012 WL
4092434, at *5-6 (E.D. Cal. Sept. 17, 2012) (same).

        2.   Analysis

    This Court finds persuasive the line of cases holding that
because the DOT is always silent concerning a sit/stand option,
no actual conflict exists between the DOT and a VE's testimony
about such a requirement.   See, e.g., Strain, 2014 WL 2472312, at
*2; Gilmour, 2014 WL 3749458, at *8.   Rather, the VE's testimony
"supplements" the DOT.   See Herrera v. Colvin, No. ED CV
13-1734-SP, 2014 WL 3572227, at *9 (C.D. Cal. July 21, 2014).   As
Defendant notes (J. Stip. at 18), to hold otherwise would mean

that VEs always create conflicts with the DOT whenever they
mention any of the multitude of things about a job not expressly
addressed in the DOT.   Plaintiff correctly notes the lack of
controlling circuit precedent on this issue, but he misplaces his
reliance on Coleman v. Astrue, 423 F. App'x 754 (9th Cir. 2011).
(See J. Stip. at 15.)   Coleman is not on point because the ALJ
there failed to ask the VE whether his testimony conflicted with
the DOT, and the Commissioner "concede[d]" that such error
violated Massachi, 486 F.3d at 1152.   Coleman, 423 F. App'x at
756.   Here, in contrast, the VE was asked to identify any
conflict between his opinion and the DOT, and he implicitly
confirmed that no such conflict existed concerning the sit/stand
option by listing and resolving a different conflict, regarding
the skill requirement of "gate guard." (See AR 227-28.)   The
VE's specialized knowledge and expertise formed the necessary
foundation to support his explanation that no conflict existed as
to the sit/stand option.   See Bayliss v. Barnhart, 427 F.3d 1211,
1218 (9th Cir. 2005).   Courts have rejected claims based on
conflict — even at step five — when a DOT description does not on
its face conflict with the claimant's RFC if the VE's testimony
or the tasks described by the DOT confirm that the job would
accommodate the claimant's limitations.   See, e.g., Guevara v.
Colvin, No. CV 12-01988 AGR, 2013 WL 1294388, at *7-8 (C.D. Cal.
Mar. 28, 2013); Huerta v. Astrue, No. EDCV 11-1868-MLG, 2012 WL
2865898, at *2 (C.D. Cal. July 12, 2012); McBride, 2014 WL

788685, at *8.  That is the case here.[12]

Accordingly, remand is not warranted on this basis.

**VI.  CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[13] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice.


DATED: <u>November 29, 2016</u>     <u>JEAN ROSENBLUTH</u>
                                     JEAN ROSENBLUTH
                                     U.S. Magistrate Judge

---

[12] <u>Coleman</u> is also readily distinguished because the claimant there had to "switch between sitting, standing, and walking at least briefly every hour," 423 F. App'x at 755, whereas Plaintiff was able to sit, stand, or walk for two hours each at a time (<u>see</u> AR 29 (adopting limitations at AR 504)) and could perform each function for a total of six hours a day (AR 504).  Thus, any conflict was less apparent than in <u>Coleman</u>.

[13] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

23